# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1338

_____

Sandra Breeding,

           Appellant,

    v.

Arthur J. Gallagher and Co.,

           Appellee.

Appeal from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted: September 25, 1998
Filed: January 15, 1999

_____

Before RICHARD S. ARNOLD, BEAM, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Sandra Breeding appeals the district court's grant of summary judgment in favor of Arthur J. Gallagher and Co. (Gallagher) in this employment discrimination case. We affirm in part and reverse in part.

I.

Viewing the evidence in the light most favorable to Ms. Breeding, as we must in this summary judgment context, the record includes the following: Gallagher hired

Ms. Breeding as a Customer Service Representative (CSR) in 1986. She was 42 years old at that time. In 1990, the company purchased another firm and integrated a large number of managers from the newly acquired firm into Gallagher's existing business, including Don Chase and Sandy Gross who became Ms. Breeding's new supervisors. Other supervisors in the hierarchy above Ms. Breeding during the relevant time period were Joel Caveness, Lance Carlson, and James Agnew. Ms. Breeding contends that from that point on, the company developed a hostile atmosphere of discrimination in which she was often yelled at and unfairly criticized. On her 1990 performance evaluation, she wrote that she felt she was being singled out because she was the oldest CSR. (Appellant's App. at 145.) She complains that supervisors Caveness and Carlson failed to address this concern and even asked her to take back the statement.

Ms. Breeding contends that her supervisor, Don Chase, used offensive language, made sexually inappropriate comments, and fondled his genitals in front of her on a continuous basis. In her deposition testimony, she asserts that she "talked to Sandy [Gross] about it, and she said that is just the way he is." (Id. at 64.) Ms. Breeding complains that Chase treated young, attractive CSRs more favorably than he treated her. Ms. Breeding also asserts that Chase denied her a promotional opportunity by hiring a young male, John Bickel, instead of Ms. Breeding to fill the position of Ms. Debbie Ferger, a woman for whom Ms. Breeding had done some work in the past. Ms. Breeding was required to do work for Bickel from time to time, but she was unable to get along well with him. Ms. Breeding contends that Mr. Chase yelled at her for not getting along with Bickel. Once in 1992, he told her he thought the reason Ms. Breeding and Mr. Bickel did not get along was that Ms. Breeding was old enough to be Bickel's mother.

Ms. Breeding contends that she was denied raises from 1992 until her resignation in 1995. She states that she is unaware of any other CSR who did not receive yearly raises, but the record shows that she was not evaluated in 1993 and that 15 others were also denied raises in 1994. Ms. Breeding complains that she was held to a stricter

performance level than other younger CSRs. She contends that she was treated severely for committing minor typographical and accounting errors, for her lack of knowledge about the insurance business, and for her trouble handling various computer programs. She complains that she was denied training and did not have a computer until her last six months on the job. She says her supervisors' conduct was not merely critical, but demeaning and threatening, and that the younger employees were given more training and more opportunities.

Ms. Breeding presents affidavits of other CSRs, who assert they were also subject to a discriminatory atmosphere and felt that the company was hostile toward women. One CSR asserted that Area President James Agnew met with the CSRs once a year to ask how the company could make things better at work, and while many complained about treatment by their managers and supervisors (including Don Chase), Agnew failed to investigate or seek to remedy their complaints. She also overheard Joel Caveness say that he had "hired one CSR because she had nice legs." (Appellant's App. at 102.)

In a meeting on July 14, 1995, Ms. Breeding says Sandy Gross and Joel Caveness confronted her with and berated her for her typing errors and for not getting along with certain people. She asserts that at one point, Caveness asked, "'How much longer do you want to work? . . . [W]e know you are old and you are not going to be here that much longer.'" (Appellant's App. at 71.) She left the meeting in tears and returned the following Monday with her resignation letter. In the letter, she stated that she was resigning due to "constant badgering" about typographical errors, bookkeeping errors, and personality conflicts; and because she was not properly trained, did not have an up-to-date computer terminal, and did not get a raise. Additionally, her resignation letter complained of Don Chase's statement that she was old enough to be Bickel's mother. Ms. Breeding's resignation letter concluded with the following statement: "I have had enough harrassment [sic] and discrimnation [sic] that my health can take [sic]." (Id. at 163.) After presenting this letter, she was escorted to her car by Sandy

Gross, who said that "[s]he was told to do these things to [Ms. Breeding]." (Id. at 83.)

Ms. Breeding brought suit against Gallagher, alleging employment discrimination on the basis of her sex and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-2(a) (1994); the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a) (1994); and the Missouri Human Rights Act (MHRA), Mo. Ann. Stat. § 213.055 (West 1996). Specifically, she alleged discriminatory treatment, a hostile work environment, and constructive discharge due to intolerable working conditions. Gallagher moved for summary judgment, and the district court granted the motion, concluding that Ms. Breeding had not presented sufficient evidence to reasonably support her claims. Ms. Breeding appeals.

## II.

We review de novo a grant of summary judgment, using the same standards as the district court applied. Lynn v. Deaconess Med. Ctr.-West Campus, 160 F.3d 484, 486 (8th Cir. 1998). "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id.; Fed. R. Civ. P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Summary judgment seldom should be granted in discrimination cases where inferences are often the basis of the claim, and "summary judgment should not be granted unless the evidence could not support any reasonable inference" of discrimination. Lynn, 160 F.3d at 486-87.

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of, among other things, the individual's sex. 42 U.S.C. § 2000e-2(a)(1). See Oncale v. Sundown Offshore Servs., Inc., 118 S. Ct. 998, 1001 (1998). The ADEA makes it unlawful for employers to discriminate on the basis of an individual's

4

age if that individual is over 40 years old.  29 U.S.C. §§ 623(a)(1), 631(a).  See also Denesha v. Farmers Ins. Exch.,  Nos. 97-4373/97-4374, 1998 WL 762521 at *3 (8th Cir. Nov. 3, 1998).  "Our analysis is the same for both the state and federal claims because decisions under the various federal employment discrimination statutes are applicable and authoritative under the Missouri Human Rights Act as well as federal law."  Finley v. Empiregas, Inc. of Potosi, 975 F.2d  467, 473 (8th Cir. 1992) (internal quotations and citation omitted)).

Ms. Breeding first contends that she has made out a submissible case of sex and age discrimination under either the direct evidence framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), or the indirect evidence, burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  "When a plaintiff puts forth direct evidence that an illegal criterion, such as age [or sex], was used in the employer's decision to terminate the plaintiff," we apply the standards enunciated in Price Waterhouse v. Hopkins, as modified by § 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m).  Fast v. Southern Union Co., 149 F.3d 885, 889 (8th Cir. 1998).  Under this modified Price Waterhouse standard, a defendant is liable for discrimination upon proof by direct evidence that an employer acted on the basis of a discriminatory motive, and proof that the employer would have made the same decision absent the discriminatory motive is only relevant to determining the appropriate remedy.  See id.

When a plaintiff is unable to put forth direct evidence of age or sex discrimination, we apply the burden-shifting analysis of McDonnell Douglas, which first requires the plaintiff to demonstrate a prima facie case of discrimination.  Id. at 890; see also Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1332 n.5 (8th Cir. 1996) (explaining that we apply this framework in both Title VII cases and in the ADEA context).  The elements of a prima facie case are not inflexible and vary slightly with the specific facts of each case.  Hindman v. Transkrit Corp., 145 F.3d 986, 990-91 (8th Cir. 1998).  Ms. Breeding must demonstrate (1) that she is within the protected

class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (persons under 40 in the ADEA context or of the opposite gender in the Title VII sex discrimination context) were not treated the same. See Kneibert v. Thomson Newspapers, Michigan Inc., 129 F.3d 444, 451 n.4 (8th Cir. 1997) (defining the prima facie case in the ADEA context); Lyoch v. Anheuser-Busch Cos., 139 F.3d 612, 614 (8th Cir. 1998) (defining the prima facie case in Title VII context). The burden then shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action. See Fast, 149 F.3d. at 890. If the employer articulates such a reason, the plaintiff must then demonstrate that the employer's stated reason is pretextual and that the real reason for the employer's adverse employment action was unlawful age or sex discrimination. See id.; Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995). "In differentiating between direct and indirect evidence of age discrimination, we must, in part, distinguish comments which demonstrate a discriminatory animus in the decisional process from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Fast, 149 F.3d at 889 (internal quotations and citations omitted).

Ms. Breeding contends that the following nine incidents amount to direct evidence of sex and age discrimination: (1) Susan Baskett observed that Gallagher hires female CSRs who are young and attractive; (2) Bridget Hawkins stated that she recommended a male for a vacant CSR position but Sandy Gross said, "I'd be afraid to hire a male for a CSR position, because he would be likely to advance too quickly;" (3) Bridget Hawkins described an incident where Area President Jim Agnew joked that he liked to keep the women subservient, and Hawkins asserted she was treated less favorably after she complained about the conduct; (4) Kathy Papcun said one hiring manager, Joel Caveness, stated he hired a CSR because she had nice legs; (5) Papcun also said she heard male managers joke to Sandy Gross that she should hire pretty, tall, blonde girls; (6) Sandy Gross stated her supervisor, Joel Caveness, wanted to know whether job applicants were attractive; (7) Ms. Breeding stated her supervisor, Don

6

Chase, became angry that she was not getting along with Bickel and wondered aloud whether it was because she was old enough to be Bickel's mother; (8) at the final meeting between Ms. Breeding, Sandy Gross, and Joel Caveness, Caveness asked how much longer she wanted to work, because "we know you are old and not going to work here much longer;" and (9) as Sandy Gross escorted Ms. Breeding to her car after she resigned, Gross said she was "told to do these things" to Ms. Breeding.

We conclude that Ms. Breeding has not presented a submissible case of either direct or indirect evidence of either age or sex discrimination against her, because she has not demonstrated that she suffered any adverse employment action.[1] None of the statements listed above in support of her claims were related to any decisional process that adversely affected Ms. Breeding's employment. To demonstrate that she suffered an adverse employment action, Ms. Breeding asserts that she was treated more harshly than men or the younger CSRs (all of whom were women) for typographical errors, accounting errors, and socializing, and that she was not allowed to take vacation time to care for her injured son. The record, however, shows that she was allowed to take all of her vacation time when she wanted it (see Supp. App. at 174-75), that all CSRs were criticized for socializing (see Appellant's App. at 95), and that she was merely speculating or assuming that younger CSRs had not been criticized for typographical and accounting errors (see Supp. App. at 250). Ms. Breeding's performance evaluations consistently indicate she lacked knowledge in the field, lacked technical skill, and failed to meet her training objectives. Ms. Breeding complains that she was not properly trained, but admits she did not go to the seminars and classes she was required to attend and admits she committed typographical, grammatical, and

---

[1]While a constructive discharge could satisfy the element of an adverse employment action, we reject Ms. Breeding's constructive discharge claim later in this opinion so there is no need to discuss it here. For the reasons stated below, the evidence fails to support her claim of constructive discharge.

bookkeeping errors. Ms. Breeding suffered no adverse actions other than being "yelled at" for these errors that she admits making.

Ms. Breeding also contends that she suffered an adverse employment action when she was discriminatorily denied a promotion and salary increases. The one instance in which she asserts she was denied a promotional opportunity was when John Bickel (a young male right out of college) was hired to fill Debbie Ferger's position. Ms. Breeding had applied for the position and thought she was the more qualified candidate, despite performance evaluations that indicated concern over her lack of knowledge and technical skills. Although Ms. Breeding was required to fill in and do some of the duties of this position when Ms. Ferger was absent, she has not demonstrated on this record that she was qualified for the position. See Lyoch, 139 F.3d at 614 (noting plaintiff must demonstrate she is qualified in order to make out a failure-to-promote claim). The record contains no evidence to indicate that the decision to hire Bickel was influenced by a discriminatory animus toward women rather than the applicants' respective qualifications.

Ms. Breeding asserts that she was discriminatorily denied a raise from 1992 until she resigned in 1995. According to the record, Ms. Breeding received a raise in October 1992 and was not evaluated again until January 1994, but she received a substantial Christmas bonus in 1993. She did not receive a raise following her 1994 evaluation. Contrary to her assertion that she was the only employee who did not receive a raise, fifteen others--including her supervisor Sandy Gross and the young John Bickel--likewise received no raise in 1994. Ten of those fifteen employees were males. Furthermore, none of the nine incidents or comments by supervisors listed above in support of her claim of direct evidence are alleged to have any relation to the salary decision-making process, and as such, they are stray remarks or isolated incidents which do not raise an inference of discrimination. See Oncale, 118 S. Ct. at 1002 (noting in the Title VII context that a statement including a sex-related comment is not evidence of discrimination unless persons of one sex are disadvantaged in the

8

terms of their employment on the basis of their sex while members of the other sex are not). Thus, Ms. Breeding's failure to receive a raise does not reflect a discriminatory attitude on the part of Gallagher.

Next, Ms. Breeding asserts she presented a submissible claim that Gallagher subjected her to a hostile working environment due to her age and sex. The district court's order was written without the benefit of the Supreme Court's latest enunciations of the standards for an actionable hostile environment harassment case.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2270 (1998); Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292-93 (1998). Harassment based on an individual's sex, in violation of Title VII, or age, in violation of the ADEA, is actionable when that harassment is "so 'severe or pervasive' as to 'alter the conditions of the victim's employment and create an abusive working environment.'" Faragher, 118 S. Ct. at 2283 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)) (other internal quotations omitted); see also Oncale, 118 S. Ct. at 1001 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To be actionable, harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive, and courts make this determination "by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 118 S. Ct. at 2283 (internal quotations omitted). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (internal quotations omitted). "[S]poradic use of abusive language, gender-related jokes, and occasional teasing" are "the ordinary tribulations of the workplace," and as such, they do not amount to actionable harassment. Id. at 2284 (internal quotations omitted).

There is in this case insufficient evidence of harassment on the basis of age to support a claim. The two specific age-related comments by supervisors Chase and Caveness (one statement made in 1992 and the other in 1995) were isolated incidents and were not sufficiently derogatory or demeaning to permit a finding that they altered the terms of Ms. Breeding's employment. Ms. Breeding felt she was unfairly criticized and often yelled at, but these conditions, while not desirable, do not amount to actionable harassment on the basis of age.

The sexual harassment hostile work environment claim presents a more troubling scenario. Ms. Breeding asserts that her supervisor, Don Chase, fondled his genitals in front of her and used lewd and sexually inappropriate language. She asserts that this conduct was continuous while he was her supervisor. Ms. Breeding states that she complained of Chase's conduct to another supervisor, Sandy Gross, and Gross minimized the conduct stating, "that is just the way he is." (Appellant's App. at 64.) Ms. Breeding presented affidavit testimony of other CSRs stating that they had observed Chase's conduct and inappropriate sexual comments. See Howard v. Burns Bros., Co., 149 F.3d 835, 838 (8th Cir. 1998) (noting "harassment of employees other than the plaintiff [is] relevant to show pervasiveness of the hostile environment"). The other CSRs had complained about such conduct to area vice president, James Agnew, but he took no action. In his deposition, Agnew admitted that he had heard of complaints about Chase's language and conduct of fondling himself. This type of

conduct could be found by a jury to be sufficiently offensive to have altered Ms. Breeding's working conditions. See Howard, 149 F.3d at 840 ("Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury."). We cannot say that such conduct is insufficient as a matter of law to constitute actionable sexual harassment. Cf. Rorie v. United Parcel Serv., Inc., 151 F.3d 757, 762 (8th Cir. 1998) (holding, "we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law"). Accordingly, we respectfully conclude that the district court erred by granting summary judgment on Ms. Breeding's sexual harassment hostile environment claim.

Ms. Breeding's final claim is that she was constructively discharged. To show "constructive discharge, a plaintiff must show more than just a Title VII violation by her employer." Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998). "A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." Johnson v. Runyon, 137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), cert. denied, 119 S. Ct. 264 (1998). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." Summit v. S-B Power Tool, 121 F.3d 416, 421 (8th Cir. 1997) (internal quotations omitted), cert. denied, 118 S. Ct. 1185 (1998). The intent element is satisfied by a demonstration that quitting was "a reasonably foreseeable consequence of the employer's discriminatory actions." Id. The employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly. Id. See also Howard, 149 F.3d at 841-42 (discussing recent cases defining what type of conditions are intolerable for purposes of constructive discharge).

11

We conclude that the conditions of which Ms. Breeding complains, even if they make out a basis for a sexual harassment hostile environment claim, do not amount to sufficient evidence to support a finding of constructive discharge. We note again that there is no evidence that age or sex discrimination, rather than actual performance problems, prompted the reprimands and the poor performance evaluations. The working atmosphere was not ideal, but "a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994). There is similarly no evidence that Ms. Breeding was denied a promotion on the basis of age or sex, and in any event, losing a single promotional opportunity is not a sufficient reason to quit or to constitute constructive discharge. See Summit, 121 F.3d at 421. The two stray age-related comments (one made in 1992 and one made in 1995) were not so demeaning or abusive as to demonstrate an intolerable working environment intended to force Ms. Breeding to quit. Finally, although there may be evidence from which a jury could find sexual harassment, we conclude that the facts alleged in this case even when viewed in the light most favorable to Ms. Breeding are not so intolerable that a reasonable person would be forced to quit.

### III.

Accordingly, we reverse the district court's grant of summary judgment on Ms. Breeding's sexual harassment hostile environment claim and affirm the grant of summary judgment on all other claims.

RICHARD S. ARNOLD, Circuit Judge, concurring in part and dissenting in part.

The Court today remands for trial plaintiff's hostile-work-environment claim based on sexual harassment. I join this portion of the Court's opinion.

I also agree that the evidence on the age claim was insufficient to justify submission to a jury.

With respect to the constructive-discharge claim based on sex discrimination, however, I respectfully dissent. When all of the evidence in this case is considered together, including the incidents listed on pages 6 and 7, <u>ante</u>, and the grossly offensive conduct attributed to Mr. Chase, I believe that a jury could rationally find that Ms. Breeding was subjected to working conditions that no reasonable, self-respecting woman should be expected to tolerate. It should be added, of course, that the testimony about what Mr. Chase is supposed to have done is only an accusation at this stage. It may be that the trier of fact, after hearing both sides, would not believe the accusation. But that issue should go to the jury, in my view, on the constructive-discharge theory, as well as the hostile-work-environment theory.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

13